IN RE MAXUS ENERGY CORPORATION, et al., Reorganized Debtors.

New Jersey Department of Environmental Protection, et al., Plaintiff,

v.

Occidental Chemical Corporation, et al., Defendants.

Case No. 16–11501 (CSS) Jointly Administered
Adv. Pro. No.: 16–51025 (CSS)

United States Bankruptcy Court, D. Delaware.

August 2, 2017

652

RICHARDS LAYTON & FINGER, P.A., Mark D. Collins, Michael J. Merchant, Brendan J. Schlauch, One Rodney Square, 920 North King Street, Wilmington, DE 19801 and GIBBS & BRUNS LLP, Kathy D. Patrick, 1100 Louisiana Street, Suite 5300, Houston, TX 77002, Counsel for Occidental Chemical Corporation

YOUNG CONAWAY STARGATT & TAYLOR LLP, M. Blake Cleary, Joseph M. Barry, Travis G. Buchann, 1000 North King Street, Wilmington, DE 19801 and

MORRISON & FOERSTER LLP, James M. Peck, Lorenzo Marinuzzi, Jennifer L. Marines, J. Alexander Lawrence, 250 West 55 th Street, New York, New York 10019, Counsel for Debtors and Debtors–in Possession

**OPINION**

Sontchi, J.

**INTRODUCTION**

Before the Court is a motion for clarification or, in the alternative, reconsideration (the "Motion for Clarification") with respect to the Court's previous ruling that certain claims stemming from a civil action (the "NJ Environmental Litigation") were to be remanded to New Jersey.[1] The Motion for Clarification is brought by Occidental Chemical Corporation ("Occidental"), a named defendant in the NJ Environmental Litigation, as well as the Debtors'[2] largest unsecured creditor.[3]

Occidental requests clarification or, in the alternative, reconsideration regarding three aspects of the Court's Opinion, each of which relates to (i) the Court's determination that the claims at issue in the Motion to Remand were property of the Debtors' estates, and, ultimately, (ii) whether Occidental's alter ego claims asserted against Repsol and the YPF Entities in

the New Jersey Environmental Litigation are currently property of the Debtors' estates under section 541 of the Bankruptcy Code.

With respect to reconsideration, Occidental requests that the Court reconsider its finding that the OCC Claims are property of the Debtors' estates. Occidental predicates its request for reconsideration of the Court's finding on the grounds that the "issue was not fully briefed for the Court, was not the subject of any oral argument, and reaches a legal conclusion that is not supported by applicable law."[4]

The Court's previous finding that the claims were property of the Debtors' estates (i) is supported by controlling Third Circuit law, and (ii) was a necessary element for ruling on the Motion for Remand, and, therefore, does not meet the burden of "completely disregarding controlling law," nor does it result in manifest injustice necessary to warrant clarification or reconsideration under Rule 59(e).

**FACTS**[5]

On June 17, 2016 (the "Petition Date"), Maxus Energy Corporation ("Maxus") and certain of its affiliates and subsidiaries (collectively, the "Maxus Debtors" or "Debtors")[6] filed voluntary petitions under chapter 11 of title 11 of the Bankruptcy

1. *In re Maxus Energy Corporation*, 560 B.R. 111 (Bankr. D. Del. 2016) ("*In re Maxus*").

2. Del. Bankr. No. 16–11501, D.I. 1. The Debtors (or, "Maxus Debtors") are: Maxus Energy Corporation; Tierra Solutions, Inc.; Maxus International Energy Company; Maxus (U.S.) Exploration Company; and Gateway Coal Company.

3. Del. Bankr. No. 16–11501, D.I. 2, ¶ 20.

4. Motion of Occidental Chemical Corporation for Clarification or, in the Alternative, for Reconsideration of Court's Order Granting Repsol's Motion for Remand of Repsol Claims and Repsol Counter–Claim to the New Jersey

State Court, Adv. Pro. No. 16–51025, D.I. 44, ¶ 3 ("Motion for Clarification"). Hereafter, references to the Adversary Proceeding will follow the format "Adv. Pro., D.I. __" and references to the main bankruptcy proceeding will be signified by the format "D.I. __".

5. The Facts of this matter are stated more fully in *In re Maxus*, 560 B.R. 111 (Bankr. D. Del. 2016).

6. D.I. 1. The Maxus Debtors in the above-referenced chapter 11 cases are: Maxus Energy Corporation; Tierra Solutions, Inc.; Maxus International Energy Company; Maxus (U.S.) Exploration Company; and Gateway Coal Company.

Code (the "Bankruptcy Code") in this Court.[7]

On June 20, 2016, Occidental commenced an adversary proceeding by removing the NJ Environmental Litigation, which had been pending before the Superior Court of New Jersey (the "New Jersey Court"), to the United States Bankruptcy Court for the District of New Jersey (the "New Jersey Bankruptcy Court"). On June 20, 2016, Occidental moved in the New Jersey Bankruptcy Court to transfer the venue of the NJ Environmental Litigation to this Court.[8] On June 28, 2016, the New Jersey Bankruptcy Court granted Occidental's motion, and the NJ Environment Litigation was transferred to this Court.

The NJ Environmental Litigation consists of (i) the YPF Claims, brought by Occidental, alleging mainly that YPF is an alter ego of Maxus; (ii) the OCC Claims, alter ego-based claims against Repsol, and (iii) the Repsol Counterclaim, a counterclaim brought by Repsol against Occidental under the New Jersey Spill Act. The Removed Claims are thus comprised of the YPF Claims, the OCC Claims, and the Repsol Counterclaim.

On July 20, 2016, Repsol moved to remand the OCC Claims and Repsol Counterclaim to the New Jersey Court. The YPF Claims were not at issue in Repsol's motion to remand. On November 15, 2016, this Court entered the Order[9] and the Opinion,[10] granting Repsol's motion, and remanded the OCC Claims and Repsol

Counterclaim to New Jersey. Following this Court's decision to grant Repsol's motion to remand, on November 29, 2016, Occidental filed a motion for clarification or, in the alternative, for reconsideration of the Court's aforementioned Order and Opinion.

## DISCUSSION

### I.

### Rule 59(e) Standard

Federal Rule of Civil Procedure 59(e), made applicable by Federal Rule of Bankruptcy Procedure 9023, governs motions for reconsideration. The fundamental purpose of a motion for reconsideration "is to correct manifest errors of law or fact or to present newly discovered evidence."[11] Under Rule 59(e), a motion to alter or amend a judgment may be granted if the party seeking reconsideration establishes at least one of the following grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."[12]

A motion for reconsideration may not be used as a vehicle to "relitigate issues the Court has already decided,"[13] nor should Rule 59(e) "... be used to advance arguments that a party could have made before judgment, but neglected to do so."[14] However, a prior decision should be

---

7. *Id.*

8. Adv. Pro., D.I. 2.

9. *Order Granting the Motion of Repsol, S.A. Remand of Repsol Claims and Repsol Counter-Claim to New Jersey Court*, Adv. Pro., D.I. 43.

10. *In re Maxus*, 560 B.R. 111 (Bankr. D. Del. 2016).

11. *Max's Seafood Cafe ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)

(citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

12. *In re W.R. Grace & Co.*, 556 B.R. 113, 118 (Bankr. D. Del. 2016) (citing *Max's Seafood Cafe ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)).

13. *Id.*

14. *Skretvedt v. E.I. DuPont de Nemours & Co.*, No. CIV.A. 98-61-MPT, 2009 WL 1649495, at *2 (D. Del. June 12, 2009).

reconsidered "where it appears [the Court] has overlooked or misapprehended some factual matter that might reasonably have altered the result reached by the Court."[15] As this Court has previously stated, "[w]hile it is true that a motion for reconsideration should not be used to reargue the facts or applicable law, it is appropriate when the facts were presented but overlooked by the Court."[16] Occidental's Motion maintains such is the case here. Neither party alleges that there has been any change of law or newly-discovered evidence. Thus, the Motion will be viewed by the Court as based upon the question of whether the Court is presented with a need to prevent manifest injustice or correct a clear error of law or fact.

The exact meanings of the terms in the third prong of Rule 59(e) remain unsettled, and there fails to be uniform application of an agreed upon definition by courts. With respect to "manifest injustice," for purposes of Rule 59(e), various courts have observed the following:

There is no judicial consensus ... but several courts have applied the Black's Law Dictionary definition, which states that "manifest injustice" is an error in the trial court that is direct, obvious, and observable, such as a defendant's guilty plea that is involuntary or that is based on a plea agreement that the prosecution rescinds. A party may only be granted reconsideration based on manifest injustice if the error is apparent to the point of being indisputable. In order for a court to reconsider a decision due to "manifest injustice," the record presented must be so patently unfair and tainted that the error is manifestly clear to all who view it.[17]

Similarly, courts have held that a "clear error of law or fact" requires a finding that the error is "plain and indisputable ... amount[ing] to a complete disregard of the controlling law or the credible evidence in the record."[18] Motions for clarification are often evaluated under the same standard used to evaluate motions for reconsideration.[19]

**15.** *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.),* 437 B.R. 488, 490 (Bankr. D. Del. 2010) (citing *Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del. 1991) aff'd 22 F.3d 303 (3d Cir. 1994)).

**16.** *Id.* (citing *In re Chama, Inc.,* 2000 WL 33712473, at *1 (Bankr. D. Del. Sept. 21, 2000)).

**17.** *In re Titus,* 479 B.R. 362, 367–68 (Bankr. W.D. Pa. 2012) (*"Titus"*) (quoting *In re Roemmele,* 466 B.R. 706, 712 (Bankr. E.D. Pa. 2012)); *accord Teri Woods Pub., L.L.C. v. Williams,* No. CIV.A. 12-04854, 2013 WL 6388560, at *2 (E.D. Pa. Dec. 6, 2013) (*"Teri Woods"*).

**18.** *Titus,* 479 B.R. at 368 (quoting *In re Oak Park Calabasas Condominium Ass'n,* 302 B.R. 682, 683 (Bankr. C.D. Cal. 2003) (internal citations omitted)). *See also id.* ("Other courts have expressed much the same view, though in somewhat different words. *See, e.g., In re Telfair,* 745 F.Supp.2d 536, 561 (D.N.J. 2010) (the term manifest injustice is an overlap of the term manifest error of law or fact, and it means that the court overlooked some dispositive factual or legal matter that was presented to it, or alternatively that there was an error in the trial court that was direct, obvious, and observable); *Oto v. Metro. Life Ins. Co.,* 224 F.3d 601 (7th Cir. 2000), rehearing denied, cert. denied as *Beverley v. Oto,* 531 U.S. 1152, 121 S.Ct. 1097, 148 L.Ed.2d 970 (2001) (manifest error is not demonstrated by disappointment of losing party, rather it is the wholesale disregard, misapplication, or failure to recognize controlling precedent; *In re Parikh,* 397 B.R. 518 (Bankr. E.D.N.Y. 2008) (same)).

**19.** *See In re Tribune Co.,* 464 B.R. 208, 212–13 (Bankr. D. Del. 2011).

## II.

### The OCC Claims are Property of the Debtors' Estates

#### A. In re Emoral

■ As a matter of controlling law, the claims are property of the Debtors' estates. Fundamental to the Court's determination that the claims were property of the Debtors' estates, and ultimately to the Court's remand of those claims, was the Third Circuit's decision in *In re Emoral*.[20] Furthermore, interpretation of *Emoral* serves as a fundamental point of contention between Occidental and the Debtors in their respective arguments relating to the Motion for Clarification.

*Emoral* provides the current Third Circuit framework for determining whether claims predicated upon successor or alter ego liability against a third-party non-debtor constitute property of the bankruptcy estate. Specifically, *Emoral* confronted the issue of whether personal injury claims arising from the alleged wrongful conduct of the debtor could be asserted on a "mere continuation" theory of successor liability against a third-party non-debtor corporation who was the pre-petition purchaser of the debtor's assets.[21]

■ As a threshold matter, "[a]fter a company files for bankruptcy, 'creditors lack standing to assert claims that are property of the estate.'"[22] The Bankruptcy Code defines the "estate" as including "all legal or equitable interests of the debtor in property as of the commencement of the case."[23] *Emoral* expounded on this definition, holding that this necessarily includes:

> [C]auses of action, which are considered property of the bankruptcy estate if the claim existed at the commencement of the filing and debtor could have asserted the claim on his own behalf under state law. In order for a cause of action to be considered property of the estate, the claim must be a general one, with no particularized injury arising from it. On the other hand, if the claim is specific to the creditor, it is a "personal" one and is a legal or equitable interest only of the creditor. A claim for an injury is personal to the creditor if other creditors generally have no interest in that claim.[24]

To determine whether the claims in *Emoral* constituted property of the bankruptcy estate, the Third Circuit instructed that the *nature of the cause of action itself* must be examined.[25] The Third Circuit found that "[w]hile the Diacetyl Plaintiffs focus on the *individualized nature of their personal injury claims against Emoral*,"[26] they "fail to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors of Emoral."[27] The Diacetyl Plaintiffs further "fail[ed] to demonstrate how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral would succeed to all of Emoral's liabilities."[28]

---

**20.** 740 F.3d 875 (3d Cir. 2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 436, 190 L.Ed.2d 328 (2014) ("*Emoral* ").

**21.** *Id.*

**22.** *Id.* at 879 (quoting *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002) ("*Foodtown* ")).

**23.** 11 U.S.C. § 514(a)(1).

**24.** *Emoral*, 740 F.3d at 879 (internal citations and quotations omitted).

**25.** *Emoral*, 740 F.3d at 879 (emphasis added).

**26.** *Id.* (Emphasis added).

**27.** *Id.* at 880.

**28.** *Id.* at 881.

Thus, the Third Circuit ruled that the plaintiff's claims were "general" instead of "individualized," and, therefore, property of the bankruptcy estate.

Despite the fact that the claims asserted by the plaintiffs were unique, as observed by both the majority and the dissent in *Emoral*,[29] such that no other creditor could assert the specific claims stemming from successor liability alleged by the plaintiffs, the majority's opinion ultimately turned upon a distinction between the individualized nature of the underlying injury giving rise to the claims and the specific theory advanced by the plaintiffs to extend liability for their alleged cause of action. Ultimately, the majority found the latter—the theory of successor liability—to be determinative: "the Diacetyl Plaintiffs' cause of action against Aaroma would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors. Therefore, the District Court appropriately classified the cause of action as a generalized claim constituting property of the estate."[30]

█ To further illustrate the Third Circuit's rationale in *Emoral*, it is instructive to look at *In re Buildings by Jamie, Inc.*,[31] cited by the majority in the relevant portion of its holding. The *Emoral* majority observed:

[T]he court, applying New Jersey law, concluded that a debtor's individualized creditors lacked standing to bring an alter ego veil-piercing cause of action seeking recovery from non-debtor third-party defendants, because that cause of action constituted property of the bankruptcy estate. It held that because New Jersey law permits a corporation to pierce its own veil and because recovery on the alter ego claim would benefit the estate as a whole, the cause of action was "properly characterized as a general claim as to which the trustee alone has standing as representative of the estate."[32]

Thus, for purposes of determining whether a claim based upon a theory of successor or alter ego liability against a third-party non-debtor belongs to the bankruptcy estate, *Emoral* holds that, notwithstanding the individualized nature of the injury or cause of action, to the extent the other creditors *and the debtor* could pursue claims based upon the same theory, the claim in question should be considered general, and, therefore, property of the bankruptcy estate.[33]

Occidental, however, argues that *Emoral*, in fact, laid out a two-step test,

[W]ith two cumulative, and not disjunctive, criteria that must be established affirmatively before a claim may constitute property of the debtor's estate:

(1) [D]id "the claim exist[ ] at the commencement of the filing and could the debtor have asserted the claim on his own behalf under state law," and

(2) is the claim "a general one, with no particularized injury arising from it?"[34]

Alternatively, the Debtors argue that *Emoral* held that property of the estate includes *both:*

**29.** *Id.* at 883.

**30.** *Id.* at 881.

**31.** 230 B.R. 36, 43 (Bankr. D.N.J. 1998).

**32.** *Emoral*, 740 F.3d at 880–81 (citing *In re Buildings by Jamie, Inc.*, 230 B.R. at 44) (emphasis added and internal citations omitted).

**33.** *Id.*

**34.** Reply of Occidental Chemical Corporation to Debtors' Objection to the Motion of Occidental Chemical Corporation for Clarification or, in the Alternative, for Reconsideration of the Court's Order Granting Repsol's Motion for Remand of Repsol Claims and Repsol Counter Claim to New Jersey State Court, D.I. 47, ¶ 4 ("Occidental Reply").

(1) The debtor's own causes of action, which the debtor could have asserted prior to the bankruptcy case and need not be general to creditors (or have any relation to creditors); and

(2) Creditors' causes of action that are general, with no particularized injury, which could have been brought by any creditors of the debtor.[35]

Under Occidental's interpretation of *Emoral*, this Court must first find that the Debtors were, as a matter of Delaware law, capable of piercing their own corporate veil, and, therefore, could have asserted the OCC Claims outside of bankruptcy. Occidental goes on to argue that under Delaware law, it is unclear whether a wholly-owned subsidiary could, in fact, "self-pierce" and hold its shareholders liable for its debts.[36]

Occidental contends, and this Court agrees, that under the Debtors' conceptualization of *Emoral*, *solely* a showing of generalized harm would be required to find a claim property of the bankruptcy estate.[37] Occidental further argues that based upon the Debtors' interpretation of *Emoral*, "none of the cases cited to the Court on the ownership of alter ego claims would have had to discuss the question of whether a debtor can assert such claims under applicable state law—yet they all do, precisely because both criteria must be met."[38] Thus, according to Occidental, "[a] mere showing of 'generalized harm' does not suffice to render a cause of action property of the estate."[39]

■ Accordingly, this Court reads *Emoral* as setting forth a two-part test for determining whether a claim constitutes property of the bankruptcy estate: (1) the claim must be one that both existed at the commencement of the filing and that the trustee could have asserted on his own behalf under applicable state law; *and* (2) the claim must be a general one, with no particularized injury arising from it.[40]

**B. The Debtors Have Standing to Assert Alter Ego Claims Outside of Bankruptcy Under Delaware Law**

■ Occidental and the Debtors are in agreement—and correct—that no Delaware court has definitively ruled on the question of a wholly-owned subsidiary's ability to pierce its own corporate veil under Delaware law: all relevant cases merely *"predict* that a Delaware court would conclude that a Delaware corporate subsidiary can pierce its own corporate veil outside of bankruptcy."[41] For the following reasons, this Court holds that under Delaware law, a wholly-owned corporate subsidiary can, in fact, pierce its own corporate veil and hold liable a third-party non-debtor.

■ To the extent courts have predicted that a Delaware corporate subsidiary can self-pierce to hold liable a third-party non-debtor, there are three specific points to note: (1) doing so was largely in the context of a subsidiary with minority shareholders asserting a piercing claim

---

35. Debtors' Objection to the Motion of Occidental Chemical Corporation for Clarification or, in the Alternative, for Reconsideration of Court's Order Granting Repsol's Motion for Remand of Repsol Claims and Repsol Counter-Claim to New Jersey State Court, D.I. 45, ¶ 12 ("Debtors' Objection") (emphasis in original).

36. Motion for Clarification at ¶ 3.

37. Occidental Reply at ¶ 4.

38. *Id.*

39. *Id.*

40. *See, e.g., Emoral,* 740 F.3d at 879; *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 701 (2d Cir. 1989); *Foodtown,* 296 F.3d at 169 n.5.

41. See Motion for Clarification at ¶ 23; Debtors' Objection at ¶ 15 (emphasis in original).

against an oppressing parent, and in holding the subsidiary could self-pierce under Delaware law, the courts predicated their decisions on "protection of minority shareholders through fiduciary duties running to the corporation;" [42] (2) under Delaware law, parents *generally* do not owe wholly-owned subsidiaries fiduciary duties; [43] and (3) notwithstanding the foregoing, under Delaware law, a parent is found to owe fiduciary duties to its subsidiary in the context of a subsidiary's insolvency. [44]

Under the two-part *Emoral* test, the Debtors could have brought the OCC Claims under Delaware law, and, therefore, satisfy the first prong. A number of courts applying Delaware law have predicated their decisions on the existence of a finding that fiduciary duties are owed to a subsidiary as a prerequisite for a debtor-subsidiary's ability to assert claims. [45]

Occidental argues that in order for Maxus, a wholly-owned subsidiary, to pierce its own veil, fiduciary duties would need to be owed by Maxus' parent. Under Delaware law, although a parent generally does not owe fiduciary duties to a wholly-owned subsidiary, the Supreme Court of Delaware observed "that a parent owes fiduciary duties to its subsidiary when that subsidiary is insolvent ...." [46] As pointed out by the Debtors, Occidental has previously alleged that "[n]o later than June 1995 ... Maxus was insolvent or became insolvent as a result of the transfers made and obligations incurred in connection with the LBO. Since that time, Maxus has remained insolvent." [47] Furthermore, this Court has held that a parent's directors "did owe the [wholly-owned subsidiary's] creditors fiduciary duties if and when [the subsidiary] became insolvent." [48] Therefore, even if fiduciary duties owed by a parent to a subsidiary were required in determining whether Maxus could ˙ bring the OCC Claims under Delaware law, the result would still be the same, insofar as Maxus was insolvent. However, such a requirement—the existence of fiduciary duties

---

**42.** See Motion for Clarification at ¶ 23 (citing *Murray v. Miner*, 876 F.Supp. 512, 513–14 (S.D.N.Y. 1995); *MC Asset Recovery, LLC v. Southern Co.*, 2006 WL 5112612, at \*10, 2006 U.S. Dist. LEXIS 97034, at \*42 (N.D. Ga. Dec. 11, 2006) ("Although there are no Delaware cases directly on-point, several cases cited by [plaintiff] have interpreted Delaware law to permit [ ] causes of action by a corporation to pierce its own corporate veil."); *Summit Metals, Inc. v. Gray (In re Summit Metals, Inc.)*, No. 98-2870, 2004 WL 1812700 \*12, 2004 U.S. Dist. LEXIS 15819 ,\*46, (D. Del. Aug. 6, 2004) (citing *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("a shareholder owes a fiduciary duty ... if it owns a majority interest in or exercises control over the business affairs of the corporation."))).

**43.** *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 173 (Del. Ch. 2006) (emphasis added). Both Occidental and the Debtors agree on this point. *See* Motion for Clarification at ¶ 23; Debtors' Objection at ¶ 16.

**44.** *See* Debtors' Objection at ¶ 16 (citing *Tronox Inc. v. Anadarko Petrol. Corp. (In re Tronox Inc.)*, 450 B.R. 432, 438–39 (Bankr. S.D.N.Y. 2011) (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101–02 (Del. 2007) (creditors of insolvent subsidiary have standing to bring derivative action to enforce fiduciary duties)); *see also ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 415 (S.D. Texas 2008) ("Directors always owe fiduciary duties to [a Delaware] corporation. When the corporation is solvent, the beneficiaries of the duty are the shareholders of the corporation; however, if the corporation becomes insolvent, the creditors become beneficiaries of these same duties.")).

**45.** *Id.*

**46.** *Id.*

**47.** *Id.* at ¶ 17 (citing Second Amended Cross–Claims at ¶ 124).

**48.** *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 560 (Bankr. D. Del. 2012).

owed to the subsidiary as a prerequisite for piercing ones own veil—is not explicit under Delaware law, as "a trustee possess standing to bring—and by logical extension, settle and release—an alter ego claim on behalf of a creditor of the debtor, as long as the claim qualifies as a 'general' claim." [49]

 Yet, this Court is not required to make a solvency determination in order to find that Maxus, a wholly-owned subsidiary, can pierce its own veil, and, therefore, assert the claims under state law: "[b]ecause piercing the corporate veil or alter ego causes of action are based upon preventing inequity or unfairness, it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory." [50] At the end of the day, it would not comport with fundamental bankruptcy policy, nor would it be rationally or legally sound, to at one moment require that the trustee bring claims that inure to the benefit of all creditors, and then at the next moment fail to provide any legal framework under which such claims could be asserted.

### C. The OCC Claims Are General; No Particularized Harm Has Been Suffered by Occidental

With respect to whether the harm suffered by Occidental is general or particularized, the OCC Claims are clearly general, and, therefore, satisfy the second prong of the two-part *Emoral* test. As previously discussed, the majority in *Emoral* derived its ruling, in part, from placing the focus of the "general versus particularized analysis" not on the underlying harm, itself, but on the theory of liability put forth by the party bringing such claims. Again, it is instructive to look to *In re Buildings by Jamie, Inc.*, cited with approval by the majority in *Emoral*. The court in *In re Buildings by Jamie, Inc.* held that "[t]he actions of the nondebtor defendants removed property from the bankruptcy estate which effectively harmed all creditors collectively. Therefore, the trustee, acting as representative of the estate by marshaling assets for the benefit of creditors generally, was effectuating the bankruptcy policy of equality of treatment." [51]

Similar to the facts of *Emoral*, and to those cases cited by the majority, it is true that the OCC Claims are unique. As noted by Occidental, "the OCC Claims are a direct product of the indemnity provision in the Stock Purchase Agreement, which can only be invoked by Occidental." [52] However, based upon the theory of alter ego liability, and given the fact that Repsol's liability for environmental cleanup costs would inure to the benefit of all creditors, the OCC Claims are properly considered "general," and therefore property of the Debtors' estates.

## III.

### A Determination as to the Ownership of the OCC Claims Was Necessary for the Court to Rule on Repsol's Motion to Remand

#### A. Mandatory Abstention Pursuant to 28 U.S.C. § 1334(c)(2)

 A determination as to the ownership of the OCC Claims was necessary

---

**49.** See *In re Alper Holdings USA, Inc.*, 398 B.R. 736, 759 (S.D.N.Y. 2008) (citing *In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005)).

**50.** *Phar–Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1240 n 20 (3d. Cir. 1994). See also *In re Emoral*, 740 F.3d at 881.

**51.** *In re Buildings by Jamie, Inc.*, 230 B.R. at 43.

**52.** Occidental Reply at ¶ 17.

for the Court's decisions on both mandatory and permissive abstention. The doctrine of mandatory abstention applies to only "non-core" proceedings.[53] As such, the Court was required to determine whether the claims were core or non-core. The Court held that the claims were, at most, "related to" the associated Chapter 11 proceeding, and were therefore non-core proceedings.[54] By their very nature, and based upon the years of litigation associated with the claims, there was no question that the claims could have—and did—arise outside of the bankruptcy context. The Third Circuit has long recognized that alter ego actions are often considered non-core, "related to" proceedings.[55] The Court, therefore, was correct in finding the claims non-core, and was required to do so in order to rule on mandatory abstention.

*B. Permissive Abstention Pursuant to 28 U.S.C. § 1334(c)(1) or Equitable Remand Pursuant to 28 U.S.C. § 1452(b)*

With respect to the Court's permissive abstention analysis, twelve factors were considered and weighed by the Court in ultimately determining "[a]ll substantive factors in the instant permissive abstention analysis favor abstention and remand."[56] Specifically, the Court addressed ownership of the claims in connection with both the "efficient administration of the estate"[57] and "the presence in the proceeding of nondebtor parties"[58] factors. For

the reasons stated in the discussion of *Emoral, supra,* the Court was correct in determining that the claims were property of the Debtors' estates, and, more so, required to make such a finding in order to rule on the previous Motion to Remand.

## IV.

### Other Matters

Occidental requests clarification of statements in the Court's Opinion as to the ownership of the OCC Claims, specifically, the extent to which such statements are "binding on parties in interest in other contested matters or adversary proceedings in these Cases."[59] In ruling on Repsol's Motion to Remand, this Court was necessarily required to make a determination as to the ownership of the claims involved. The Court's analysis and subsequent determinations were conducted for the purpose of resolving the Motion to Remand, notwithstanding the extent to which the doctrines of res judicata, collateral estoppel, or law of the case may apply at a later date. However, these are issues for future motion practice.

▮ Additionally, to the extent Occidental requests a clarification that they did not, in fact, affirmatively assert that the Debtors owned the claims, this this Court holds that the argument that the Debtors owned the claims was implicit throughout

---

53. 28 U.S.C. § 1334(c)(2).

54. *In re Maxus Energy Corporation,* 560 B.R. at 122.

55. *See Phar–Mor, Inc.,* 22 F.3d at 1239–40 ("Yet actions by a creditor to pierce the corporate veil, or alter ego actions against the debtor corporation, are often considered non-core, 'related to' proceedings. Likewise, a proceeding by a debtor corporation to pierce the corporate veil of an entity against which it holds a judgment is also non-core. Moreover, although the proceeding in Marin differed from typical alter ego actions because it in-

volved a claim in which the debtor corporation was piercing its own veil, some courts have stated that such actions are also non-core, 'related to' proceedings.") (internal citations omitted).

56. *In re Maxus Energy Corporation,* 560 B.R. at 129.

57. Id. at 125.

58. Id. at 128.

59. Motion for Clarification at ¶ 16.

the initial briefing. The fact that Occidental's assertion that the Debtor's owned the claims was phrased such that Occidental could argue it retained the right to pursue the claims against Repsol is ultimately moot at this juncture: not only are the claims property of the Debtors' estates, but the Debtors are the exclusive party to assert such claims in a bankruptcy proceeding. The issue of shared and exclusive estate property need not be determined at this time, due to the fact that under Third Circuit precedent, given the claims are property of the Debtors' estates, the bankruptcy trustee is proper party to assert the Claims, and the "creditors are bound by the outcome of the trustee's action."[60]

## V.

### Conclusion

Because the claims existed at the commencement of the bankruptcy filing, the Debtors could have asserted the claims under state law, and due to the fact that the Claims are 'general,' the Court was correct in ruling that the claims are property of the Debtors' estates. Neither clarification nor reconsideration are warranted, as there is no clear error of fact or law, nor a need to prevent manifest injustice. For the foregoing reasons, Occidental has failed to meet the standard required under Rule 59(e), and the Motion for Clarification or, in the Alternative, Reconsideration is denied.

An order will be issued.

---

**60.** *Emoral,* 740 F.3d at 879 (citing *St. Paul* *Fire & Marine Ins. Co.,* 884 F.2d at 701).